## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DELTA MILLS, INC. ET AL. | ) Case No. 06-11144 (CSS) |
| | ) |
| Debtors. | ) Jointly Administered |
| _____ | ) |
| | ) |
| DELTA MILLS, INC., | ) |
| | ) |
| Plaintiff/Counter-Defendant, | ) |
| | ) |
| v. | ) Adv. Pro. No. 07-51707 (CSS) |
| | ) |
| GMAC COMMERCIAL FINANCE LLC, | ) Docket Nos. 14, 79 |
| | ) |
| Defendant/Counter-Plaintiff. | ) |
| | ) |
| _____ | ) |
| | ) |
| GMAC COMMERCIAL FINANCE LLC, | ) |
| | ) |
| Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| WILLIAM GARRETT, WILLIAM HARDMAN, | ) |
| AND EULER HERMES ACI, | ) |
| | ) |
| Third-Party Defendants. | ) |
| _____ | ) |

## <u>OPINION</u>[1]

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052.

Mark D. Collins
Jason M. Madron
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
        -and-
Richard D. Haddad
Erik B. Weinick
Otterbourg, Steindler, Houston
& Rosen, P.C.
230 Park Avenue
New York, New York  10169

Counsel for GMAC Commercial
Finance LLC.

Mark E. Felger
Jeffrey R. Waxman
Cozen O'Connor
Chase Manhattan Centre
1201 North Market Street
Suite 1400
Wilmington, Delaware  19801
        -and-
Christopher R. Donoho III
Matthew P. Morris
Lisa J. Fried
Matthew J. Galvin
Lovells LLP
590 Madison Avenue
New York, New York 10022

Counsel for Delta Mills, Inc.

Bradford J. Sandler
Benesch, Friedlander, Coplan
& Aronoff LLP
222 Delaware Avenue
Suite 801
Wilmington, Delaware  19801
        -and-
Alan D. Halperin
Neal W. Cohen
Halperin Battaglia Raicht, LLP
555 Madison Avenue
9th Floor
New York, New York 10022

Counsel for Euler Hermes ACI.

Donna L. Harris
Pinckney & Harris, LLC
1220 North Market Street
Suite 950
Wilmington, Delaware  19801

Counsel for William Garrett and
William Hardman.

Dated:  March 17, 2009

Sontchi, J. _____

## INTRODUCTION

Before the Court is GMAC Commercial Finance LLC's Motion for Summary Judgment Dismissing the First Amended Complaint. GMAC Commercial Finance LLC ("GMAC") served as the factor for Delta Mills, Inc.'s ("Delta") textile manufacturing business. The First Amended Complaint filed by Delta alleges numerous causes of action based upon GMAC's failure to remit to Delta payment for invoices billed to one of Delta's customers. The invoices at issue were billed to Interamericana Apparel ("Apparel"). Through the factoring arrangement with GMAC, however, Delta only sought approval of, and GMAC only approved, credit for Interamericana Products International ("Products"), an affiliate of Apparel. For each invoice at issue, Delta represented to GMAC that the customer was Products, while addressing the invoice to Apparel, which then paid GMAC.

The Court finds that there is no genuine issue of material fact in dispute. GMAC never approved credit for Apparel and, therefore, never assumed the risk of loss on the invoices at issue. Thus, summary judgment in favor of GMAC on all counts is appropriate.

## STATEMENT OF FACTS

Delta, the debtor in the underlying Chapter 11 case, was a textile manufacturer with its primary facilities located in South Carolina. GMAC and its predecessors served as Delta's accounts receivable factor for over 20 years. As Delta's factor, GMAC operated as Delta's collections department and agreed to

assume the risk of non-payment on those receivables.  Prior to May 30, 2006, the factoring relationship between Delta and GMAC was governed by the Factoring Service Agreement – Foreign Accounts Receivable, dated as of July 15, 1986 ("Factoring Agreement") and the related Export Rider Amendment, dated August 1, 1999 ("Rider").

In 2003, one of Delta's customers requested Delta to sell fabric directly to textile finishers in the Dominican Republic.  Delta entered discussions with GMAC to provide factoring services for these new customer accounts.  Delta and GMAC entered into a Letter Agreement dated September 11, 2003 ("First Letter Agreement"), covering three customers located in the Dominican Republic, including Products, for the period from September 19, 2003 through September 18, 2004.  On September 3, 2004, GMAC and Delta executed a second Letter Agreement ("Second Letter Agreement") covering the same three Dominican Republic customers for the period from September 19, 2004 through September 30, 2005.  On October 1, 2005, Delta and GMAC executed a third Letter Agreement ("Third Letter Agreement") covering the same three customers plus an additional customer for the period from October 1, 2005 through September 30, 2006.  All three Letter Agreements (collectively, the "Letter Agreements") amended the existing Factoring Agreement. [2]

---

[2] For purposes of the Motion for Summary Judgment, Products is the only relevant entity expressly covered under the Letter Agreements.

GMAC obtained third-party credit insurance through Euler Hermes ACI ("Euler Hermes") in order to cover the risk of loss on Delta's accounts receivable under the Letter Agreements. The terms of the credit insurance policy only covered those entities detailed in the Letter Agreements. During the relevant period, Delta's Chief Financial Officer, William Hardman, and Delta's Vice-President of Operations, Donald Walker, were aware GMAC had obtained credit insurance on their Dominican Republic customer accounts and knew GMAC would only assume the risk of loss on foreign customer accounts receivable if GMAC was able to obtain credit insurance.

In September 2003, Delta began shipping goods to Products and selling the receivables to GMAC under the Factoring Agreement and the Letter Agreements. Under a typical sale, Delta would input the terms of each order electronically into GMAC's Electronic Data Interchange System ("EDI System"). Orders were submitted under the customer number of the invoiced party. For example, the GMAC customer number for Products was 4372744. The relevant invoicing data was transmitted electronically via direct input into specific EDI System fields. Neither physical copies of the invoices sent to the customer nor electronic images of said invoices were transmitted to GMAC. Once the order data was submitted, GMAC would either approve the order or recheck the terms. When an order was rechecked, Delta was required to resubmit the order for approval when the order came due for delivery. Even under a recheck no physical copy nor electronic image of the invoice was sent to GMAC. After the

order was approved, Delta would ship the goods, along with a physical copy of the invoice, to the customer and the value of the invoice would be deducted from the credit line with GMAC. GMAC would then seek payment from Delta's customer.

The Products account was the subject of frequent communication between Delta and GMAC. GMAC provided a monthly aging report that detailed the status of all outstanding invoices billed to Products. These reports identified the customer as Products. In addition, Delta repeatedly requested credit line increases for the Products account.

Products is one entity in the larger Interamericana organization. The ultimate parent is Interamericana Group Corporation, a holding company. The relevant subsidiary corporations are Products, an enterprise dedicated to textiles manufacturing and Apparel, an enterprise dedicated to sales of the services offered by these companies. Apparel is the "business entity" and the "public face" of the Interamericana organization.

In March 2004, Delta modified its invoicing procedures for billing the Interamericana organization. Specifically, Delta changed the party it invoiced from Products to Apparel. The invoices reflected the same address for Apparel as for Products. However, Delta never advised GMAC of the modified invoicing procedures. Instead, despite this change in customers, Delta continued to submit invoices for goods shipped to Apparel under the Products customer number in GMAC's EDI System. Furthermore, Delta continued to submit credit line

increases for the Products account, naming the customer as Products, even after Delta switched to billing Apparel for goods shipped to the Interamericana organization.

Thereafter, GMAC continued to collect on Delta's accounts receivable for all invoices transmitted through its EDI System, including those for Products. GMAC was directed to correspond with Leda Gonzalez to coordinate collection of Delta's invoices billed to the Interamericana organization.  Ms. Gonzalez's emails identified her as affiliated with Apparel.  Furthermore, GMAC received checks for payment of invoices from Apparel.

An Amended and Restated Factoring Agreement ("Second Factoring Agreement") and related Export Receivable Rider to the Amended and Restated Factoring Agreement ("Second Rider") were executed on May 30, 2006.  The Second Rider governs "the terms and conditions under which [GMAC] will purchase from [Delta] Receivables arising from [Delta's] sales of goods . . . to customers located in the countries outside the United States and Canada."  Both the Second Factoring Agreement and the Second Rider require written approval of Delta's customers in order for GMAC to assume the risk of non-payment.[3]

---

[3]             3. CUSTOMER CREDIT APPROVAL

[Delta] shall submit to [GMAC] the principal terms of each of [Delta]'s Customers' orders for [GMAC]'s written credit approval.  [GMAC] may, in [GMAC]'s discretion, approve in writing all or a portion of [Delta]'s Customers' orders . . . .  No credit approval shall be effective … unless in writing or transmitted by [GMAC] electronically . . . .  After the Customer has accepted delivery of the goods or performance of the services, [GMAC] shall then have the Credit Risk.

The Second Factoring Agreement also provides that GMAC's assumption of the credit risk on any account shall immediately terminate if Delta breaches any representation, warranty, or covenant.[4]  Finally, the Second Factoring Agreement requires Delta to provide either a duplicate invoice or electronically transmit the invoice information, and the invoice must bear the terms of the customer order.[5]

By 2006, the Interamericana organization was in financial distress.  From July 26, 2006 through December 18, 2006, the Interamericana organization failed

---

Second Factoring Agreement ¶ 3.

> 7. [Delta] agree[s] to provide to [GMAC] the names of [Delta's] Customers, together with any additional information [GMAC] require[s], to enable [GMAC] to conduct credit investigations.  In [GMAC's] sole discretion, [GMAC] will assume a percentage of the Credit Risk on approved Customers.  [GMAC] must give credit approval in writing before [Delta] make[s] any sale.

Second Rider ¶ 7.

[4]    7. REPRESENTATIONS, WARRANTIES AND COVENANTS

> (g) [GMAC]'s Credit Risk, if any, on an Account shall immediately terminate without any action on [GMAC]'s part in the event that . . . (ii) any representation, warranty or covenant by [Delta] as to the Account is breached; or (iii) there is any change in the terms or dating on the Account without [GMAC]'s prior written approval.

Second Factoring Agreement ¶ 7.

[5]    8. INVOICING; PAYMENTS; RETURNS; NOTIFICATION

> (a) . . . With respect to each such invoice, [Delta] shall either (i) furnish [GMAC] with a legible duplicate original of the invoice accompanied by a confirmatory assignment thereof, or (ii) electronically transmit to [GMAC] the invoice details and an assignment schedule using a transmission format acceptable to [GMAC] . . . .  Each invoice shall bear the terms stated on the Customer's order, as submitted to [GMAC], whether or not the order has been approved by [GMAC], and no change from the original terms of the order shall be made without [GMAC]'s prior written consent.  Any such change not so approved by [GMAC] shall automatically terminate [GMAC]'s Credit Risk, if any, on the Account arising from [Delta]'s performance of the order.

Second Factoring Agreement ¶ 8.

to pay 142 separate invoices issued by Delta to Apparel - totaling approximately $1.5 million in the aggregate (the "Invoices").   On January 29, 2007, GMAC received an email from the Interamericana organization saying it was "winding down its business."   Subsequently, GMAC filed a claim with Euler Hermes under its credit insurance policy.   Euler Hermes requested physical copies of the original invoices supporting the claim.   Thereafter, Euler Hermes discovered the Invoices reflected sales to Apparel instead of Products, the entity for which it issued credit insurance.   Thus, on April 24, 2007, Euler Hermes denied GMAC's claim.   After Euler Hermes denied of GMAC's claim, GMAC charged back Delta's account for approximately $1.4 million, ninety percent of the approximately $1.5 million in unpaid Invoices.

Delta filed a chapter 11 bankruptcy petition in October 2006.  It filed this adversary proceeding in August 2007 and its First Amended Complaint in early October, asserting claims against GMAC for breach of contract, promissory estoppel, equitable estoppel, breach of fiduciary duties, breach of the covenant of good faith and fair dealing, and recovery of attorneys' fees, costs and expenses as well as seeking to impose a constructive trust relating to fees and expenses – all in connection with GMAC's failure to pay Delta the approximately $1.4 million charged back from Delta's account.  Subsequently, GMAC timely filed an answer as well as a counterclaim asserting common law fraud and breach of contract as well as requesting attorneys' fees and costs.  Additionally, GMAC joined third-party defendants William Garrett, the President and Chief Executive Officer of

Delta, and William Hardman, the Executive Vice President and Chief Financial Officer of Delta, asserting claims for misrepresentation and intentional interference with the Second Factoring Agreement.  GMAC also joined Euler Hermes, seeking declaratory relief that Euler Hermes's denial of GMAC's claim under the credit insurance policy was improper.  In addition, GMAC sought an award of payment and attorneys' fees and costs from Euler Hermes.

In September 2008, after a portion of the discovery period elapsed, GMAC filed a motion for summary judgment on all counts of the First Amended Complaint.  Delta opposes the motion.  This matter has been fully briefed and is ripe for decision.[6]

## LEGAL DISCUSSION

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, directs that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[7]

---

[6] The parties have requested oral argument on this matter.  However, the parties' briefing is sufficiently clear on both legal and factual matters as to obviate the need for oral argument. Thus, the Court renders its decision without oral argument and the request for oral argument is denied.  *See* Del. Bankr. L.R. 7007-3.

[7] Fed.R.Civ.P. 56.

Summary judgment is designed "to avoid trial or extensive discovery if facts are settled and dispute turns on issue of law."[8]  Its purpose is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."[9]   Furthermore, summary judgment's operative goal is "to isolate and dispose of factually unsupported claims or defenses"[10] in order to avert "full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways."[11]

When requesting summary judgment, the moving party must "put the ball in play, averring an absence of evidence to support the nonmoving party's case."[12]  In order to continue, the burden shifts to the nonmovant to identify "some factual disagreement sufficient to deflect *brevis* disposition."[13]  Not every discrepancy in the proof, however, is enough to forestall a properly supported motion for summary judgment; the "disagreement must relate to some genuine issue of material fact."[14]   In other words, the summary judgment standard "provides that the mere existence of some alleged factual dispute between the

---

[8] 11-56 MOORE'S FEDERAL PRACTICE, § 56.02 (Matthew Bender 3d ed.).

[9] *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991), *cert. denied*, 504 U.S. 985 (1992) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).

[10] *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

[11] *Mesnick*, 950 F.2d at 822.

[12] *Celotex Corp.*, 477 U.S. at 325.

[13] *Mesnick*, 950 F.2d at 822.

[14] *Id.*

parties will not defeat an otherwise properly supported motion for summary judgment."[15]

In order to demonstrate the existence of a genuine issue of material fact in a jury trial, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant.[16]  The same principles apply in a bench trial where the judge is the ultimate trier of fact; the nonmovant must obviate an adequate showing to the judge to find for the nonmovant.[17]  At the summary judgment stage, the court does not "weigh the evidence and determine the truth of the matter;" rather, the court determines "whether there is a genuine issue for trial."[18]  A material fact is one which "could alter the outcome" of the case.  It is genuine when it is "triable," that is, when reasonable minds could disagree on the result.[19]  Importantly, all reasonable

---

[15] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[16] *United States v. Jamas Day Care Ctr. Corp.*, 152 Fed.Appx. 171, 173 (3d Cir. 2005) (quoting *Olson v. GE Astrospace*, 101 F.3d 947, 950 (3d Cir. 1996) (citing *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993))). *See also Mesnick*, 950 F.2d at 822. ("... 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party [and] 'material' means that the fact is one that might affect the outcome of the suit under the governing law").

[17] *Leonard v. General Motors Corp. (In re Headquarters Dodge)*, 13 F.3d 674, 679 (3d Cir. 1993) ("A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder [sic] could return a verdict in favor of the nonmovant."). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial").

[18] *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del.2005) (quoting *Anderson*, 477 U.S. at 249).

[19] *Id*. at 210 (citing *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 301 (3d Cir. 1995)).

inferences must be drawn in favor of the nonmoving party[20] and any doubt must be read in favor of the nonmovant.[21]

The requirement that the movant supply sufficient evidence carries a significant corollary: the burden of proof is switched to the non-movant who "must present definite, competent evidence to rebut the motion."[22]    Such evidence "cannot be conjectural or problematic; it must have substance in the sense that it limits differing versions of the truth which a factfinder must resolve at an ensuing trial."[23]    Furthermore, evidence that "is merely colorable or is not significantly probative" cannot deter summary judgment.[24]    In response, "the non-moving party must adduce more than a mere scintilla of evidence in its favor;"[25] it cannot simply reassert factually unsupported allegations contained in its pleadings.[26]    In other words, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts."[27] Conversely, in a situation where there is a complete failure of proof concerning

---

[20] *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004) (citing *Suders v. Easton*, 325 F.3d 432, 435 n.2 (3d Cir. 2003)).    *See also Interim Investors Comm. v. Jacoby*, 90 B.R. 777, 780 (W.D.N.C. 1988), *aff'd*, 914 F.2d 1491 (4th Cir. 1990); *In re Holzinger*, 89 B.R. 529, 530 (Bankr. E.D. Pa.1988); and *In re Pashi*, 88 B.R. 456, 457 (Bankr. N.D. Ga.1988).

[21] *In re Cantin*, 114 B.R. 339, 341 (Bankr. D. Mass.1990); and *In re Dempster*, 59 B.R. 453, 455 (Bankr. M.D. Ga.1984).

[22] *Id. See also Mesnick*, 950 F.2d at 822.

[23] *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989).

[24] *Id. See also Anderson*, 477 U.S. at 249-50.

[25] *Id. See also In re CVEO Corp.*, 327 B.R. at 213.

[26] *See, e.g., Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

[27] *PTC v. Robert Wholey & Co. (In re Fleming Cos.)*, 2006 Bankr. LEXIS 896 at *3 (Bankr. D. Del. 2006) (citing *Matsushita Elec. Indus. Co.*, 478 US at 1356).

an essential element of the nonmoving party's case, Rule 56(c) necessarily renders all other facts immaterial and mandates a ruling in favor of the moving party.[28]

## B. Breach of Contract

Delta's first and most prominent cause of action is for breach of the Second Factoring Agreement.  Under New York law,[29] "'an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.'"[30]  Delta argues that GMAC breached the Second Factoring Agreement by failing to remit the amounts due under the unpaid Invoices.  GMAC responds that there was no breach because GMAC never approved Apparel as a customer and, thus, it is not required to remit funds for any of the unpaid Invoices issued by Delta to Apparel.  The Court agrees.  As GMAC never approved Apparel as a customer either in writing or by the parties' course of dealing, no issue of material fact exists.  GMAC did not breach the contract and summary judgment in GMAC's favor on this count is appropriate.

### i. Contract Interpretation Under New York Law

The applicable rules governing contract interpretation start with plain meaning.  Under New York law, "[w]hen interpreting a contract, the court

---

[28] *Celotex Corp.*, 477 U.S. at 317.

[29] The parties agree the Second Factoring Agreement should be interpreted under New York law. The agreement itself also requires the agreement be interpreted under New York law.

[30] *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) (quoting *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir.1994)).

should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized."[31] The starting point in gleaning the parties' intent is the plain meaning of the contract's terms.

> Where the intention of the parties is clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used. Finally, where the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument.[32]

Accordingly, in a dispute involving contract interpretation, summary judgment is appropriate in two situations.

> First, summary judgment may be granted when the language of the contract is unambiguous. . . . "Contract language is unambiguous if it has a definite and precise meaning, unattended by the danger of misconception in the purport of the [contract] itself, and concerning which there is not reasonable basis for a difference of opinion."  In such cases, courts may not consider extrinsic evidence of the parties' intent, instead determining the meaning of the contract "from the terms expressed in the instrument itself."[33]

However, if the contract language is ambiguous, summary judgment may also be appropriate if "extrinsic evidence supports a single interpretation [of the

---

[31] *Joseph v. Creek & Pines, Ltd.*, 629 N.Y.S.2d 75, 76 (N.Y. App. Div. 1995).

[32] *Fetner v. Fetner*, 741 N.Y.S.2d 256, 258 (N.Y. App. Div. 2002) (internal citations omitted).

[33] *Faulkner v. Nat'l Geographic Soc'y*, 452 F.Supp.2d 369, 375 (S.D.N.Y. 2006) (quoting *Metro. Life Ins. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990)).

contract] . . . almost as if the language had been unambiguous in the first place."[34]

### ii. The Second Factoring Agreement Is Ambiguous

GMAC argues the Second Factoring Agreement is not ambiguous.  GMAC asserts it is only required to assume the risk of non-payment for approved customers.  The Letter Agreements contain written approval of Products as a customer. However, no written authorization was ever issued approving Apparel as a customer.  Thus, because the unpaid Invoices that are the basis of Delta's claim are billed to Apparel GMAC argues it did not assume the risk of non-payment and, therefore, is not required to remit the unpaid funds for those Invoices.

Delta asserts the Second Factoring Agreement is ambiguous.  Specifically, Delta relies on the Second Factoring Agreement's integration clause.  According to Delta, the Rider and the Letter Agreements, which contain specific written approval of Products (among others), are not a part of the Second Factoring Agreement.   Since the Second Factoring Agreement makes no reference to specific customers, Delta contends that it is ambiguous and the Court must use extrinsic evidence to determine which customers were approved.   The Court agrees.

---

[34] *Id.* at 375-76 (quoting *Nycal Corp. v. Inoco PLC*, 988 F.Supp 296, 299 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1998)).

The Second Factoring Agreement, which was executed on May 30, 2006, requires written approval of Delta's customers in order for GMAC to assume the risk of non-payment.[35]  The Second Rider, which was also executed on May 30, 2006, governs "the terms and conditions under which [GMAC] will purchase from [Delta] Receivables arising from [Delta's] sales of goods . . . to customers located in the countries outside the United States and Canada."[36]  The Second Rider also requires written approval of Delta's customers.[37]

Thus, Delta did not assume the risk of non-payment for any of Delta's customers outside the United States and Canada, unless Delta approved those customers in writing.  GMAC asserts that the list of Delta's approved customers in the Dominican Republic is contained in the Letter Agreements.  *However, the Third Letter Agreement was executed prior to the execution of the Second Factoring Agreement and the Second Rider.*

Moreover the Second Factoring Agreement is an integrated agreement.

> This agreement, and any concurrent or subsequent written supplements thereto or amendments thereof signed by both of [GMAC] and [Delta], represent the entire understanding of the parties and supersede all inconsistent agreements and communications, written or oral, between [Delta]'s and [GMAC]'s officers, employees, agents and other representatives.[38]

---

[35] See n. 3 supra.

[36] Second Rider at 1.

[37] See n. 3 supra.

[38] Second Factoring Agreement ¶ 12(b).

The Second Rider, executed concurrently, is part of the Second Factoring Agreement.[39]  The Second Factoring Agreement does not incorporate any prior factoring agreements, nor does it incorporate any prior amendments to those agreements.  Rather, the Second Factoring Agreement specifically supersedes all prior agreements to the extent those agreements are "inconsistent" with the Second Factoring Agreement.[40]  Moreover, neither the Second Letter Agreement nor the Second Rider contains a list of Delta's approved customers.

As the Third Letter Agreement is a prior agreement between the parties that was superseded to the extent it is inconsistent with the Second Factoring Agreement and the Second Rider, it is unclear under the four corners of the operative contract whether Delta's approved list of customers set forth in the Third Letter Agreement is a part of the parties' existing agreement.  Put another way, the Second Factoring Agreement and the Second Rider are ambiguous as to which, if any, of Delta's customers have been approved by GMAC.  Thus, the Court must consider extrinsic evidence to determine whether the various documents support "a single interpretation" as to which customers were approved by GMAC and, thus, are covered under the Second Factoring Agreement and the Second Rider.[41]

---

[39] Second Factoring Agreement ¶12(b).

[40] *Id*.

[41] *Faulkner*, 452 F.Supp.2d at 375-76.

### iii. Upon Consideration Of The Extrinsic Evidence, The Third Letter Agreement Is An Integrated Part Of The Second Factoring Agreement And The Second Rider.

Even where a contract is ambiguous, "a court appropriately may dispose of a contract interpretation dispute on summary judgment . . . if [it] finds either that there is no relevant extrinsic evidence or that there is relevant extrinsic evidence, but such evidence is so one-sided that it does not create a genuine issue of material fact."[42]   Here, the extrinsic evidence related to customer approval encompasses (1) the pre-existing written customer approvals found in the Third Letter Agreement; and (2) the parties' course of dealing.

#### a. The Letter Agreements

The Third Letter Agreement provides written approval of Products as a customer.  The Second Factoring Agreement, however, does not incorporate any prior agreements, nor does it incorporate any prior amendments to those agreements.  Rather, the Second Factoring Agreement specifically supersedes all prior agreements, including the Third Letter Agreement, to the extent those agreements are "inconsistent" with the Second Factoring Agreement.[43]

Nevertheless, the Third Letter Agreement is admissible as extrinsic evidence "notwithstanding an integration clause where it would not modify or contradict the terms of a contract, but would explain certain ambiguities in the

---

[42] *Id.* at 377 (quoting *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 299 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1998))

[43] *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 383, 404 (S.D.N.Y. 1999) (holding a prior agreement cannot be incorporated into a subsequent agreement containing an integration clause explicitly extinguishing all prior agreements).

contract."[44]   Here, since the Second Factoring Agreement contains no list of approved customers nor is there any subsequent agreement detailing approved customers, the Letter Agreements are admissible as extrinsic evidence to explain the ambiguity of which customers, if any, were approved.

Under all three Letter Agreements, Products is identified as an approved customer.   None of the Letter Agreements makes any mention of Products. These Letter Agreements are the only evidence in the record that provide *written* customer approval for any Interamericana entity.

Moreover, Delta does not dispute the fact that Products was approved in writing and Apparel was not.   If no customers were approved, the Second Factoring Agreement would be a nullity – an absurd result.   Thus, since the Second Factoring Agreement and Second Rider require GMAC's approval of customers in writing and the only written evidence of any customer approval are the Letter Agreements, those agreements are persuasive evidence that previously approved customers, such as Products, were approved and those not previously approved, such as Apparel, were not.

### b. The Parties' Course of Dealing

Delta argues summary judgment is inappropriate because a genuine issue of material fact exists as to whether GMAC implicitly accepted the risk of non-payment for Apparel through the parties' course of dealing.   Specifically, Delta points to the following:

---

[44] *Id*.

- GMAC gathered extensive due diligence on the Interamericana organization before agreeing to act as factor of Delta Mills's Interamericana receivables and, in doing so, reviewed financial information for Products and Apparel.

- GMAC accepted more than $600,000 in fees in connection with invoices that, at all times, were paid by Apparel;

- GMAC understood that Apparel operated as the business division and public face of Products;

- GMAC created but one customer identification number for "Interamericana" despite undeniably being aware of the existence of both Products and Apparel;

- GMAC knew that Apparel frequently paid invoices that had been sent to Products and routinely solicited payment from Apparel;

- GMAC developed a strong rapport with Apparel in order to chase Interamericana for late payments and gather information necessary to submit requests for credit line increases to Euler Hermes;

- GMAC consistently referred to Apparel internally as the "customer;"

- GMAC requested credit line increases for Interamericana from Euler Hermes on the strength of Apparel's financial information;

- Prior to Euler Hermes's denial of coverage on GMAC's insurance claim for Apparel's unpaid invoices, GMAC had shown every indication that it intended to cover the credit risk for those invoices; and

- GMAC had the right to request original invoices.

Conversely, GMAC also relies on the parties' course of dealing to show it was unaware Delta changed customers from Products to Apparel.  Specifically, GMAC points to the following:

- Delta submitted the invoices for Apparel under the Products customer number;

- The monthly aging reports sent by GMAC to Delta reflected the customer as Products, not Apparel, even after Delta began invoicing Apparel;

- GMAC treated Products and Apparel as separate entities by maintaining separate customer numbers in its computer system;

- Delta submitted a request for credit approval for Apparel, which was never approved by GMAC; and

- Delta was unaware GMAC obtained insurance from Euler Hermes for the credit risk on Delta's account for Products and had not on its account for Apparel.

"Unlike the subjective intent or post hoc conclusions of contracting parties, the parties' course of dealing throughout the life of a contract is highly relevant in determining the meaning of the terms of the agreement."[45]  Extrinsic evidence may be used to establish "[a] course of dealing [which] is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."[46]  An established course of dealing may be used

---

[45] *Faulkner*, 452 F. Supp. 2d at 381 (citing *Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006)).

[46] Restatement (Second) of Contracts § 223(1).

to interpret or supplement an agreement, or may supply an omitted term.[47]   A

critical element of the course of dealing analysis requires a common knowledge

and understanding of the parties.[48]   Evidence of a common knowledge or

understanding is especially critical where a party is deemed to have ratified

terms by failing to object.[49]   "An inference of the parties' common knowledge or

understanding that is based upon a prior course of dealings is [a] question of

fact."[50]

Here, Delta argues that the parties' course of dealing establishes a

common knowledge and understanding wherein Apparel became an approved

customer under the Second Factoring Agreement.   The Court disagrees.

Although Delta was aware it was shipping products to Apparel and invoicing

Apparel, no facts reflect that GMAC had knowledge of Delta's switch from

Products to Apparel.   Indeed, the facts reflect the opposite -- GMAC had no

knowledge of Delta's change in the invoiced party.   As such, no common

knowledge or understanding developed between Delta and GMAC whereby

Apparel became an approved customer and GMAC assumed the risk of non-

payment for invoices billed to Apparel.

First, Delta argues GMAC gathered extensive due diligence on

Interamericana before agreeing to factor Delta Mills's Interamericana receivables

---

[47] Restatement (Second) of Contracts § 223(2) & cmt. b.

[48] *New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24, 31 (2d Cir. 1997)

[49] *Ward v. Nat'l Geographic Soc'y*, 284 Fed. Appx. 822, 824 (2d Cir. 2008).

[50] *New Moon Shipping*, 121 F.3d at 31.

and, in doing so, reviewed financial information for Products and Apparel. Assuming this is true, it does not establish a common understanding that GMAC would assume the risk of non-payment for Apparel. Simply because GMAC knew there were multiple Interamericana entities and examined the financial statements of those entities does not give rise to the inference GMAC agreed, implicitly or explicitly, to assume the risk of non-payment for any and all Interamericana entities.

Second, Delta argues GMAC accepted more than $600,000 in fees in connection with invoices that, at all times, were paid by Apparel. Similarly, Delta asserts GMAC knew that Apparel frequently paid invoices that had been sent to Products and routinely solicited payment from Apparel. Again, assuming this is true, payment of one entity's invoices by an affiliated corporate entity is not unusual and, in this case, is of no moment. Many large organizations have consolidated cash management systems that routinely make payments on behalf of affiliated entities. Furthermore, GMAC's primary concern was to collect payment on Delta's receivables, not question which entity was making those payments. Collecting payment on receivables from an affiliate does not obligate GMAC to assume the risk of non-payment for any future invoices billed to that affiliate nor does it give rise to a common understanding of such.

Third, Delta argues GMAC developed a strong rapport with Apparel in order to chase Interamericana for late payments and gather information

necessary to submit requests to credit line increases to Euler Hermes.  Again, it is not unusual for one entity to make payments on behalf of another affiliate or to provide management services for that entity.  Developing a working relationship with personnel at a managing affiliate to speed receivable collections is a prudent step for a factor and does not give rise to an obligation to assume the risk of non-payment for any future invoices billed to the affiliate.

Fourth, Delta notes GMAC understood that Apparel operated as the business division and the public face of the Interamericana organization.  This does not give rise to a common understanding that GMAC assumed the risk of non-payment for Apparel.  A factor has no duty to investigate the corporate structure of its clients' buyers and failure to so does not result in the factor undertaking the risk of non-payment by that entity.  Instead, GMAC relied on Delta's statements that Products was the customer.  To conclude otherwise, there must be a common understanding that Delta was misleading GMAC about the identity of its customer.  Certainly GMAC had no such understanding.

Fifth, Delta asserts GMAC created but one customer identification number for "Interamericana" despite undeniably being aware of both Products and Apparel.  This is simply incorrect.  The evidence unequivocally establishes that GMAC maintained different customer identification numbers for entities within the Interamericana organization, including Products and Apparel.

Sixth, Delta argues GMAC consistently referred to Apparel internally as the customer.  However, the basis for this statement are two emails forwarded

internally by GMAC employees.  The original emails are remittance advices for wire transfers with a signature line reflecting the sender is associated with Apparel.  When the remittance advices were forwarded internally within GMAC, the sender noted the recipient should see the "customer's" remittance advices.  This does not reflect common knowledge or understanding.  The emails contain remittance advices directing how GMAC should apply wire transfers to invoices it believed were billed to Products.   Thus, it is not unusual that GMAC employees would refer to the information as from the "customer."  The fact that the remittance advices were transmitted by an individual claiming to be associated with Apparel does not reflect a common understanding that Apparel was the customer.  Rather, it simply reflects the fact that Apparel, an affiliated entity, was paying some of Products invoices.  Moreover, two internal emails casually referring to apparel as the customer are insufficient to establish a genuine issue of fact as to whether Apparel was, in fact, the approved customer.

Seventh, Delta argues GMAC requested increases of its credit line from Euler Hermes on the strength of Apparel's financials.  Assuming this is true, it has no relevance to whether there was common knowledge and understanding between Delta and GMAC.  Simply because GMAC provided Euler Hermes with a complete picture of the financial condition of the Interamericana organization does not change the fact GMAC only requested, and Euler Hermes only provided, insurance coverage for the Products receivables.

Eighth, Delta argues that prior to denial of coverage by Euler Hermes on GMAC's insurance claim for Apparel's unpaid invoices, GMAC had shown every indication that it intended to cover the credit risk for those invoices. Assuming this is true, it overlooks the reason GMAC believed it assumed the risk of non-payment on the Invoices. The evidence shows that GMAC believed the non-paying customer was Products, a customer it specifically approved in writing. However, once Euler Hermes began its investigation and obtained copies of the physical Invoices from Delta, Euler Hermes determined the customer was, in fact, Apparel. It is entirely consistent with GMAC's position to give Delta every indication it intended to pay Delta on those invoices until Euler Hermes (and, thus, GMAC) discovered the discrepancy in invoicing.

Ninth, Delta argues GMAC had the right to request the original invoices and, therefore, could have discovered Delta changed the invoiced party. The essence of this argument is that GMAC should not have relied on Delta's statements and should have been more diligent in verifying Delta's information. GMAC was under no duty to do so. Conversely, Delta was under a contractual obligation to provide accurate invoice information to GMAC.[51] The fact that GMAC did not request the original invoices from Delta does not make Apparel an approved customer or create a common understanding as such between GMAC and Delta.

---

[51] Second Factoring Agreement ¶ 8(a) ("Each invoice shall bear the terms stated on the Customer's order, as submitted to Factor.").

Not only do Delta's arguments in support of its position fail but GMAC's arguments are clearly supported by the record. The evidence shows that GMAC was unaware and had no reason to suspect of Delta's switch from invoicing Products to invoicing Apparel. Most critically, Delta continued to submit invoices into GMAC's EDI System under the Products customer number, even when the physical invoices were billed to Apparel. Thus, the invoice information transmitted to GMAC by Delta made it appear as if Products was the customer, even when Delta was actually billing Apparel.

Moreover, GMAC sent Delta monthly aging reports reflecting the status of each of Delta's customer accounts. The aging for the Interamericana account clearly names the account as Products's. Yet Delta itself never inquired as to why GMAC's aging reports reflected a different customer than Apparel.

Another critical fact is that Delta submitted a request for credit approval for Apparel. This request was never approved. Thus, not only was GMAC unaware Delta began invoicing Apparel, there is evidence GMAC declined to approve Apparel as a customer.

Thus, the course of dealing does not establish a common knowledge or understanding that Delta's actual customer was Apparel as opposed to Products. Instead, the course of dealing supports the conclusion that GMAC had no knowledge or reason to suspect the actual customer was Apparel; and, at all times up until Euler Hermes's denial of GMAC's credit insurance claim, GMAC believed Products was the customer.

### c. Conclusion

The Letter Agreements, which establish that Products was the only entity from the Interamericana organization approved in writing as a customer, and the parties' course of dealing support a single interpretation of the Second Factoring Agreement, the Second Rider and the Third Letter Agreement. Specifically, Products was an approved customer and Apparel was not. With that ambiguity resolved, the Court must enforce the plain meaning of the contract. Accordingly, there is no issue of material fact with respect to the breach of contract claim. Summary judgment in GMAC's favor on this count is appropriate.

### C. Promissory Estoppel

Delta also alleges a cause of action for promissory estoppel. Promissory estoppel requires: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance.[52] Delta argues it relied on GMAC's clear and unambiguous promise to factor Delta's sales to "Interamericana." The Court disagrees. There is no evidence GMAC agreed to factor Delta's sales to any and all entities within the Interamericana organization. Instead, GMAC promised to factor Delta's sales to Products. Neither is there any evidence GMAC made a clear and

---

[52] *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000); *Cyberchron Corp. v. Calldata Sys. Dev. Inc.*, 47 F.3d 39, 44 (2d Cir. 1995).

unambiguous promise to factor sales to Apparel, or any other Interamericana entity, other than Products.[53]   Delta's cause of action for promissory estoppel fails and summary judgment in favor of GMAC on this count is appropriate.

## D. Equitable Estoppel

Delta's also alleges a cause of action for equitable estoppel.   Equitable estoppel requires: (1) an act constituting a concealment of facts or a false misrepresentation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoers; (4) reliance upon the misrepresentation which causes the innocent party to change its position to its substantial detriment.[54]

In order to prevail at trial, Delta must show either GMAC misrepresented that it would assume the risk for invoices billed to Apparel or it concealed the fact it would not assume the risk for invoices billed to Apparel.   Delta argues GMAC misrepresented it would assume the risk of non-payment for invoices billed to Apparel by routinely conducting business with Apparel, soliciting and accepting payments from Apparel, and facilitating credit line increases for Interamericana on the basis of Apparel financials.   However, these acts do not constitute representations.   At best, these acts may be considered "acts constituting a concealment of facts."   "Silence in the face of an explicit contrary

---

[53] *See Totalplan Corp. of Am. v. Colborne*, 14 F.3d 824, 833 (2d Cir. 1994) (holding plaintiff cannot prevail on theory of promissory estoppel where party failed to demonstrate a clear and unambiguous promise).

[54] *Gen. Elec. Capital Corp. v. Armadora*, 37 F.3d 41, 45 (2d Cir 1994).

assumption by an innocent party may constitute a concealment of facts . . . for estoppel purposes."[55]   However, equitable estoppel requires actual or constructive knowledge of the true facts.  A party cannot conceal facts of which it has no knowledge.

Here, GMAC had no knowledge, either actual or constructive, that Delta was actually invoicing Apparel instead of Products.  The primary reason GMAC was unaware of this fact was because Delta was transmitting erroneous invoice data to GMAC.  Delta cannot claim GMAC represented it would assume the risk of non-payment for invoices billed to Apparel or concealed the fact it would not assume the risk of non-payment on those invoices when Delta actively transmitted incorrect invoice information to GMAC and GMAC was never aware Delta was billing Apparel.

Accordingly, Delta cannot prevail on the equitable estoppel claim and summary judgment in favor of GMAC  on this count is appropriate.

**E. Breach of Fiduciary Duty**

Delta also asserts a cause of action for breach of fiduciary duty.  Delta argues the close relationship between Delta and its factor, GMAC, gave rise to a fiduciary relationship.  The Court disagrees.

> The law in New York is well settled that the usual relationship of bank and customer is that of debtor and creditor, rather than that of fiduciaries.  This is particularly true where the relationship of bank to customer is that of a factor. . . .   The factor is acting

---

[55] *Armadora*, 37 F.3d at 45.

solely for its own benefit; the factor is not undertaking, explicitly or by fair implication, to benefit its client in the conduct of the latter's business affairs; and in the absence of such duty or undertaking, the client can derive no legal rights or benefits from what the factor does or does not do.

Moreover, in the absence of an express contractual obligation to the contrary, courts refrain from imposing extra-contractual duties on banks. In 'unusual circumstances' a fiduciary relationship may arise between a bank and a customer if there is either a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding or an assumption of control and responsibility. . . . [H]owever, the mere fact that a corporation borrowed money from the same bank for several years is insufficient to transform the relationship into one in which the bank is a fiduciary.[56]

In this case, the relationship between Delta and GMAC was a debtor-creditor relationship. Their relationship was based upon the extension of credit by GMAC through the purchase of Delta's accounts receivable. Neither the Second Factoring Agreement, the Second Rider, nor any of the Letter Agreements contain any provision creating express fiduciary obligations between Delta and GMAC.

Nonetheless, Delta asserts a fiduciary relationship should be imposed because Delta had no choice but to 'repose trust and confidence' in GMAC to investigate the creditworthiness of Delta's customers. This argument fails to consider that the purpose of the creditworthiness investigation was for GMAC's

---

[56] *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 945 F. Supp. 693, 712 (S.D.N.Y. 1996) (citations and quotation omitted).

benefit, not Delta's.  GMAC would only assume the risk of non-payment for invoices sent to approved customers.  Before GMAC would approve a customer, it conducted a credit investigation.  Or, in the case of foreign customers, GMAC would apply for credit insurance from a third party, such as Euler Hermes, which would then perform the credit investigation.  Only once GMAC obtained the insurance, or a promise of insurance, would GMAC approve the customer.  Thus, the credit investigation was solely for the benefit of GMAC and of no concern to Delta.  Delta's only concern was whether the customer was approved in writing.  If so, GMAC would assume the risk of non-payment and Delta would be covered.  If not, Delta retained that credit risk.  The factoring relationship between Delta and GMAC was common and ordinary.  No unusual circumstances were present that would justify the imposition of a fiduciary relationship.  Accordingly, the claim for breach of fiduciary duty cannot stand.  Summary judgment in favor of GMAC on this count is appropriate.

### F. Breach of the Covenant of Good Faith and Fair Dealing

Delta also asserts a cause of action for breach of the covenant of good faith and fair dealing.  New York law implies a covenant of good faith and fair dealing in all contracts.[57]  The covenant includes "any promises which a reasonable person in the position of the promise would be justified in understanding were included" and a "pledge that neither party shall do anything which will have the

---

[57] *Fruitico, S.A. v. Bankers Trust Co.*, 833 F. Supp. 288, 300 (S.D.N.Y. 1993); *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (N.Y. 1995).

effect of destroying or injuring the right of the other party to receive the fruits of the contract."[58]   However, the duty of good faith and fair dealing cannot create new contractual rights between the parties.[59]

> A plaintiff always can allege a violation of an express covenant.   If there has been such a violation, of course, the court need not reach the question of whether or not an *implied* covenant has been violated. That inquiry surfaces where, while the express terms may not have been technically breached, one party has nonetheless effectively deprived the other of those express, explicitly bargained-for benefits.   In such a case, a court will read an implied covenant of good faith and fair dealing into a contract to ensure that neither party deprives the other of "the fruits of the agreement."   Such a covenant is implied only where the implied term is consistent with other mutually agreed upon terms in the contract.  In other words, the implied covenant will only aid and further the explicit terms of the agreement and will never impose an obligation which would be inconsistent with other terms of the contractual relationship. Viewed another way, the implied covenant of good faith is breached only when one party seeks to prevent the contract's performance or to withhold its benefits.  As a result, it thus ensures that parties to a contract perform the substantive, bargained-for terms of their agreement.[60]

Delta argues the parties' agreement required GMAC to serve as factor and to assume the credit risk for goods shipped to Delta Mills's Dominican customer, Interamericana.   In essence, Delta asserts the "fruits of the contract" Delta

---

[58] *Dalton*, 87 N.Y.2d at 389 (citations and quotation omitted).

[59] *Fruitico*, 833 F. Supp. at 300; *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 763 F. Supp. 36, 44 (S.D.N.Y. 1991); *Dalton*, 87 N.Y.2d at 389; *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 305 (N.Y. 1983).

[60] *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1516-17 (S.D.N.Y. 1989) (citations and quotations omitted).

bargained for required GMAC to provide factoring services and assume the risk of non-payment for invoices billed to any and all entities within the Interamericana organization.  This is incorrect.

At the risk of sounding redundant, GMAC agreed to assume the risk of non-payment for Delta's foreign customer only if those customers were approved in writing.  Products was the only Interamericana entity so approved. GMAC was under a duty to exercise its approval of customers in a rational and non-arbitrary manner.[61]  However, the implied covenant of good faith does not require GMAC to assume the risk of non-payment for Delta's customers GMAC never approved.  As the agreement expressly required approval of customers in writing, the implied covenant cannot create an obligation to assume the risk of non-payment by unapproved customers, which would contradict the express terms of the contract and add additional terms that were not part of the original bargain.

Delta makes much of its assertion that the commercial realities of this action would be the same even if Delta Mills had invoiced Products.  This assertion is based on the fact that Products and Apparel both became insolvent and shut down simultaneously.  However, this overlooks the fact that GMAC obtained credit insurance for Products, not Apparel.  Presumably, if Delta had been invoicing Products, GMAC would have been able to collect on the credit

---

[61] *See Dalton*, 87 N.Y.2d at 389.

insurance policy issued by Euler Hermes.  Thus, the "commercial realities" would, in fact, be vastly different if Delta had invoiced the approved customer.

Accordingly, the implied covenant of good faith and fair dealing does not require GMAC to assume the risk of non-payment for unapproved entities. Summary judgment in favor of GMAC on this count is appropriate.

## G. Attorneys' Fees

GMAC has charged Delta's account for an undisclosed sum of attorneys' fees and costs.  GMAC asserts it is entitled to these fees for reimbursement of its costs in protecting its rights under the Second Factoring Agreement.  Delta argues GMAC's reimbursements are improper and, therefore, requests recovery of these fees, an imposition of a constructive trust on all fees, as well as an accounting.

"Under the American Rule, 'the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser.'"[62]  However, this default rule may be overcome by a statute authorizing payment of fees, or by an enforceable contract, allocating payment of fees.[63]

Here, GMAC is entitled to fees under the Second Factoring Agreement the Ratification and Amendment Agreement (the "Ratification Agreement") approved by this Court, and the Final Order (a) Authorizing Debtors to Obtain Post-Petition Financing and Grant Security Interest and Superpriority

---

[62] *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 448 (2007) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 US. 240, 247 (1975)).

[63] *Id*.

Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c); (B)

Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; and (C) Authorizing

Debtors to Enter Into Agreements with GMAC Commercial Finance LLC (the

"Final Financing Order").  The Second Factoring Agreement provides:

> Factor may charge to Client's account the amount of reasonable legal fees (including, without limitation, fees, expenses and costs payable or allocable to attorneys retained or employed by Factor) and other costs, fees and expenses incurred by Factor . . . in enforcing Factor's rights hereunder or in connection with the litigation of any controversy arising out of this agreement.[64]

Delta ratified the Second Factoring Agreement in the Ratification Agreement[65]

and those agreements were specifically approved by this Court's Final Financing

Order.[66]  Furthermore, both the Ratification Agreement and the Final Financing

---

[64] Second Factoring Agreement ¶ 12(a).

[65]

> [Delta] and Guarantor each hereby acknowledges, confirms and agrees that . . . each of the Existing Factoring Agreements to which it is a party was duly executed and delivered to [GMAC] by [Delta] and Guarantor and each is in full force and effect, . . . the agreements and obligations of [Delta] and Guarantor contained in the Existing Factoring Agreements constitute the legal, valid and binding obligations of [Delta] and Guarantor enforceable against [Delta] and Guarantor in accordance with its respective terms, . . . and [GMAC] is and shall be entitled to all of the rights, remedies and benefits provided for in the Factoring Agreements and the Financing Order.

Ratification and Amendment Agreement ¶ 2.4(b).

[66]

> Approval. . . .  [T]he Factoring Agreements (including, without limitation, the Factoring Agreement) and each term set forth in . . . the . . . Factoring Agreements are approved to the extent necessary to implement the terms and provisions of this Final Order.  All such terms, conditions and covenants shall be sufficient and conclusive evidence of . . . each Debtor's

Order provide for payment of attorneys' fees.[67]   Thus, GMAC is authorized to charge Delta's account for any attorney's fees and costs incurred in litigation arising out of the Second Factoring Agreement.

GMAC has made a prima facie showing of its entitlement of attorney's fees and costs incurred in the litigation of this action.   Accordingly, Delta must make some showing of a triable issue of fact regarding the alleged impropriety of

---

> assumption and adoption of all the terms, conditions, and covenants of the . . . Factoring Agreements for all purposes, including, without limitation, to the extent applicable, . . . all Obligations . . . including . . . Factor's actual and reasonable . . . attorney fees and legal expenses, as more fully set forth in the . . . Factoring Agreements, as applicable.

Final Financing Order 1.3.2.

[67] The Ratification and Amendment Agreement provides:

> [Delta] shall pay to [GMAC] on demand all costs and expenses that [GMAC] pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Ratification Agreement and the other . . . Factoring Agreements . . . and the transactions contemplated thereby, including, without limitation . . .reasonable . . . attorneys' . . . fees and disbursements . . . .  The foregoing shall not be construed to limit any other provisions of the . . . Factoring Agreements regarding costs and expenses to be paid by [Delta].

Ratification and Amendment Agreement ¶ 10.6.

The Final Financing Order provides:

> The Debtors are authorized and directed to make all payments and transfers of Estate property to Factor, Agent and Lenders as provided, permitted and/or required under the . . . Factoring Agreements . . . .  Without limiting the generality of the foregoing, the Debtors are authorized and directed, without further order of this Court, to pay or reimburse each of Factor, Agent, and Lenders for all present and future costs and expenses, including, without limitation, all reasonable consultant fees, documented professional fess and fees and disbursement of counsel, paid or incurred by any of Factor, Agent, and Lenders in connection with . . . the Factoring Agreements.

Final Financing Order 1.4.

GMAC's charges for attorney's fees and expenses.[68]  Yet Delta's papers are devoid of any factual basis showing GMAC's charges for fees and expenses were improper.  In fact, Delta fails to aver a dollar amount of disputed charges, let alone which actual charges are disputed.  Instead, Delta asserts, with respect to GMAC's claimed entitlement to fees and disbursements, it is Delta, not GMAC, that is entitled to answers.  Delta argues since GMAC has failed to explain sufficiently the charges for fees and expenses, Delta Mills can only assume that the charges are not justified.  In opposition to a summary judgment motion, this argument misses the mark.  Discovery in this case went on for several months, with multiple witness depositions, and the production of thousands of pages of documents. Yet Delta has failed to identify a single disputed charge.

GMAC has shown a proper contractual basis for attorney's fees and costs. Delta has failed to identify a single disputed charge, or even a total amount of disputed charges.  Therefore, there is no material issue of fact.  Summary judgment in favor of GMAC on this count is appropriate.

## CONCLUSION

For the reasons set forth above, the Court will grant GMAC Commercial Finance LLC's Motion for Summary Dismissing the First Amended Complaint. An order will be issued.

---

[68] *Mesnick*, 950 F.2d at 822.